UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
ANDREW E. ROTH, derivatively on behalf of                   :
LEAP WIRELESS INTERNATIONAL, INC.,                          :
                                                            :         11 Civ. 4820 (JPO)
                                        Plaintiff,          :
                                                            :         MEMORANDUM
                            -v-                             :         OPINION AND ORDER
                                                            :
THE GOLDMAN SACHS GROUP, INC.,                              :
GOLDMAN, SACHS & CO., and LEAP                              :
WIRELESS INTERNATIONAL, INC.,                               :
                                                            :
                                        Defendants.         :
                                                            :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

 Plaintiff Andrew E. Roth brings this action, derivatively on behalf of Leap Wireless

International, Inc. ("Leap Wireless" or the "Company") against The Goldman Sachs Group, Inc.

and Goldman, Sachs & Co. (collectively, the "Goldman Defendants" or "Goldman"), and Leap

Wireless as nominal defendant, under Section 16(b) of the Securities Exchange Act (the

"Exchange Act"), 15 U.S.C. § 78p(b) ("Section 16(b)").

 Currently before the Court are motions by Goldman and Leap Wireless to dismiss the

complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure.  (Dkt. Nos. 13 and 18.)  For the reasons that follow, the

motions to dismiss the complaint are granted.

## I. Background

 The following facts are drawn from the allegations in the Complaint, which are presumed

true for the purpose of this motion.  The Complaint also incorporates by reference particular

Securities and Exchange Commission ("SEC") filings by Goldman, and those documents will be considered as well.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 152-53 (2d Cir. 2002) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." (citation omitted)).

### A.    The Parties

Plaintiff is an owner of common stock of Leap Wireless.

Leap Wireless is a Delaware corporation with its principal place of business in San Diego, California.

The Goldman Sachs Group, Inc. is a Delaware Corporation with its principal place of business in New York, New York.  Goldman, Sachs & Co. is a wholly owned subsidiary of the Goldman Sachs Group, Inc.

### B.    The Transactions

At certain times relevant to this case, Goldman owned greater than 10% of the shares of a particular class of Leap Wireless common stock.  This subjected Goldman to the reporting and disgorgement requirements of Section 16 of the Exchange Act.[1]

In particular, Goldman's ownership stake rose above 10% as a result of purchases of Leap Wireless securities on September 30, 2009.  On October 2, 2009, Goldman disposed of a sufficient number of Leap Wireless shares to bring its ownership stake below 10%.

---

[1] Plaintiff alleges that the Goldman Defendants constitute a "group" under Section 13(d)(3) of the Exchange Act, 15 U.S.C. § 78m(d)(3) ("When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection.").  Although the Court need not accept as true this legal conclusion, the defendants do not dispute it.  Thus, for purposes of this motion, the Court will assume  that the Goldman Defendants were collectively subject to Section 16 of the Exchange Act.

On September 30, 2009, during the time in which Goldman owned more than 10% of the shares of Leap Wireless common stock, it wrote 32,000 short call options covering 3.2 million shares of Leap Wireless stock, exercisable at $39 per share, with an expiration date of January 16, 2010 (the "Options").  The Options were sold for $0.33 per share, for a total of $1,056,000.[2]

On October 6, 2009, Goldman advised Leap Wireless by letter that it had generated certain profits from purchases and sales of Leap Wireless securities during the period in which it owned more than 10% of Leap Wireless's common stock.  Pursuant to Section 16(b), Goldman voluntarily offered to disgorge these profits, which totaled approximately $203,000.  This amount did not include any profits garnered by Goldman as a result of the sale and expiration of the Options.

### C.     Plaintiff's Demand

On or about June 14, 2011, Plaintiff made demand upon Leap Wireless to commence a lawsuit pursuant to Section 16(b) to disgorge the profits earned by Goldman from the sale and expiration of the Options.  Leap Wireless's counsel informed Plaintiff by letter that the Company had settled claims relating to Goldman's profits during the relevant period for the sum of $203,000 and that the Company "considers the matter closed."  (Complaint, Dkt. No. 1, ¶ 17.)

On July 13, 2011, Plaintiff filed this action.  On October 19, 2011, the Goldman Defendants filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. No. 13.) Leap Wireless separately also moved to dismiss the complaint.  (Dkt. No. 18.)  Leap Wireless

---

[2] The Complaint alleges certain other transactions concerning the purchase and sale of different sets of options, but Plaintiff declined to oppose the defendants' motions to dismiss the claims with respect to these other options.  (*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint, Dkt. No. 21 ("Opp.") at 1 n.2.)  Accordingly, the claims based on transactions other than the writing of the 32,000 short call options on September 30, 2009 are hereby dismissed.

submitted a one-page memorandum of law stating that the Company "joins in each basis of the

Goldman Defendants' motion to dismiss."  (Memorandum of Law of Defendant Leap Wireless

International, Inc. in Support of Motion to Dismiss Plaintiff's Complaint, Dkt. No. 19, at 1.)

## II.   Discussion

### A.   Motion to Dismiss Standard

In order to survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must

plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, ---, 129 S.Ct.

1937, 1949 (2009).  Where a plaintiff has not "nudged [his or her] claims across the line from

conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.  The

Court must accept as true all well-pleaded factual allegations in the complaint, and "draw [ ] all

inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir.

2006) (internal quotation marks omitted).  On the other hand, "the tenet that a court must accept

as true all of the allegations contained in a complaint is inapplicable to legal conclusions.

Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  *Iqbal*, 129 S.Ct. at 1949; *see also Twombly*, 550 U.S. at 555 (noting

that a court is "not bound to accept as true a legal conclusion couched as a factual allegation"

(quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))).

**B.      Section 16 Claims**

**1.      Section 16 in General**

Plaintiff alleges that Goldman is liable under the "short swing profits" rule set forth in Section 16 of the Exchange Act.  Section 16 seeks to "prevent[] the unfair use of information which may have been obtained" by statutory insiders of a company by requiring that any short swing profits—that is, profits from purchases and sales of the company's equity securities taking place within six months of each other—be forfeited to the company.[3]  15 U.S.C. § 78p(b).  *See Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998) ("Section 16(b) of the Exchange Act seeks to deter 'insiders,' who are presumed to possess material information about the issuer, from using such information as a basis for purchasing or selling the issuer's equity securities at an advantage over persons with whom they trade.").

The statute applies to directors, officers, and "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security" of the issuer (a "10% owner").   15 U.S.C. § 78p(a).  Section 16(a) imposes certain reporting obligations on these insiders.  Section 16(b) provides in relevant part that

> any profit realized by [such insider] from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) . . . within any period of less than six months, . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such [insider] in entering into such transaction of holding the security . . . purchased or of not repurchasing the security . . . sold for a period exceeding six months.

---

[3] Although the statute itself does not use the term "short swing profits," the term is usually defined by reference to the statute's provisions.  For example, Black's Law Dictionary defines "short swing profits" as "[p]rofits made by a corporate insider on the purchase and sale (or sale and purchase) of company stock within a six-month period." Black's Law Dictionary (9th ed. 2009).

15 U.S.C. § 78p(b).  A suit to recover such profits may be maintained by the company or

derivatively by a shareholder.  *Id.*

      Courts have observed that "Section 16(b) operates mechanically, and makes no moral

distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt

the letter of the prohibition."  *Magma Power Co. v. Dow Chem. Co*., 136 F.3d 316, 320-21 (2d

Cir. 1998).  Indeed, under the plain language of the statute, "[n]o showing of actual misuse of

inside information or of unlawful intent is necessary to compel disgorgement."  *Id.* (citation

omitted).  Thus, although an insider could make improper use of inside information to profit

through trades taking place six months and one day from each other, the statute applies only to

purchases and sales within six months of each other.  Conversely, an insider could make trades

within less than six months of each other without the benefit of any particular inside knowledge,

but would be subject to the statute's requirement to return profits from those trades to the

company.  This is because, as the Supreme Court noted, "the only method Congress deemed

effective to curb the evils of insider trading was a flat rule taking the profits out of a class of

transactions in which the possibility of abuse was believed to be intolerably great."  *Reliance*

*Elec. Co. v. Emerson Elec. Co*., 404 U.S. 418, 422 (1972).  The Court quoted an earlier decision

from the Seventh Circuit, which observed that

> [i]n order to achieve its goals, Congress chose a relatively arbitrary
> rule capable of easy administration. The objective standard of
> Section 16(b) imposes strict liability upon substantially all
> transactions occurring within the statutory time period, regardless
> of the intent of the insider or the existence of actual speculation.
> This approach maximized the ability of the rule to eradicate
> speculative abuses by reducing difficulties in proof.  Such arbitrary
> and sweeping coverage was deemed necessary to insure the
> optimum prophylactic effect.

*Id.* (quoting *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir. 1970)); *see also Magma Power*, 136 F.3d at 321 ("Congress believed that such a blunt instrument was the only way to control insider trading.").

In light of the arguably "arbitrary and sweeping coverage" of the statute, *Reliance*, 404 U.S. at 422, courts have been consistent in holding that in order for liability to attach, the requirements of the statute must be met—it is not enough for a transaction to fall under the broader category of evils that the statute was meant to curb.  As the Second Circuit has held, "even if a transaction is found to present the opportunity for speculative abuse, there can be no liability under Section 16(b) unless the statutory requirements are also met." *Gwozdzinsky*, 156 F.3d at 310 (citation omitted).  Thus, "[i]n short, this statute imposes liability without fault [but only] within its narrowly drawn limits." *Foremost-McKesson, Inc. v. Provident Sec. Co.,* 423 U.S. 232, 251 (1976).  *Cf. id.* at 252 ("It is inappropriate to reach the harsh result of imposing § 16(b)'s liability without fault on the basis of unclear language.  If Congress wishes to impose such liability, we must assume it will do so expressly or by unmistakable inference.").

As the Second Circuit has summarized, "liability under Section 16(b) does not attach unless the plaintiff proves that there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Gwozdzinsky*, 156 F.3d at 308.  The statute itself expressly provides that it "shall not be construed to cover any transaction where [a 10% owner] was not such both at the time of the purchase and sale, or the sale and purchase, of the security . . . involved."  15 U.S.C. § 78p(b).  Thus, for example, if someone is a statutory insider by virtue of being a 10% owner, but is a 10% owner for only one of the two transactions

involved (the purchase or the sale), but not the other, then there can be no liability under the statute.

### 2.      Section 16(b) and Derivative Securities

In 1991, the Securities and Exchange Commission ("SEC") amended its regulations in response to the "proliferation of derivative securities and the popularity of exchange traded options," and the "uncertainty surrounding the application of Section 16" to these types of securities.  Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-28869, Investment Company Act Release No. 35-25254, 56 Fed. Reg. 7242-01, 7248 (Feb. 21, 1991) ("1991 Report").  A derivative security is a "financial instrument that derive[s its] value (hence the name) from an underlying security or index."  *Magma Power*, 136 F.3d at 321.  The amendments to the regulations were based on the SEC's conclusion that "holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of section 16, since the value of the derivative securities is a function of or related to the value of the underlying equity security."  1991 Report at 7248.  Accordingly, transactions involving derivative securities could be equated to purchases and sales of the underlying securities for purposes of incurring liability under Section 16(b).

As discussed above, the derivative securities at issue in this case were "short call options."  A "call option" is an "an option in the holder to purchase specified securities at a specified price [referred to as a 'strike price' or 'exercise price'] for a specified period of time."  Harold S. Bloomenthal and Samuel Wolff, 3 Sec. & Fed. Corp. Law § 2:91 (2d ed.).  The converse of a "call" is a "put," which gives the holder "the right to require the purchase of a security at a specified price for a specified period of time."  *Id.*  The writer of the option (*i.e.*, the seller) sells the option for an agreed upon premium.  If the option holder exercises the option at

any point up until the expiration, then the option writer must sell the security to the option holder at the strike price (in the case of a call option), or buy the security from the option holder at the strike price (in the case of a put option).  If the option holder does not exercise the option before the expiration date, then the option writer's obligation ceases.  In either case, the option writer typically retains the premium payment.

The SEC's 1991 regulations of derivatives are based on examining the actual financial consequences of purchasing or selling particular options.  Thus, a "put equivalent position" is "a derivative security position that increases in value as the value of the underlying equity decreases, including, but not limited to, a long put option and a short call option position."  17 C.F.R. § 240.16a-1(h).  The Second Circuit has explained how this definition applies to short call options:

> A party establishes a short call option position by writing a call option.  In doing so, the writer obligates him- or herself to sell the security to the holder of the option (who is then in a "long" position with respect to the securities) at the agreed-upon "strike price" whenever the holder demands it, except no later than the date the option expires.  The value of the writer's "derivative security position" does indeed "increase[ ] in value as the value of the underlying equity decreases," because the likelihood that the writer will be able to pocket the premium the purchaser paid him or her for the right to purchase the shares without the purchaser ever exercising that right increases as the value of the underlying equity decreases.  If the option does expire unexercised— presumably because the market price was below the strike price when the purchaser might otherwise have executed it—the writer's obligation to sell the security ceases, terminating his or her put equivalent position.

*Allaire Corp. v. Okumus*, 433 F.3d 248, 251 (2d Cir. 2006).[4]

---

[4] Conversely, a "call equivalent position" is defined as "a derivative security position that increases in value as the value of the underlying equity increases, including, but not limited to, a long convertible security, a long call option, and a short put option position." 17 C.F.R. § 240.16a-1(b).

Under the SEC's amended regulations,

> [t]he establishment of or increase in a call equivalent position or liquidation of or decrease in a put equivalent position shall be deemed a purchase of the underlying security for purposes of section 16(b) of the Act, and the establishment of or increase in a put equivalent position or liquidation of or decrease in a call equivalent position shall be deemed a sale of the underlying securities for purposes of section 16(b) of the Act.

17 C.F.R. § 240.16b-6(a) ("Rule 16b-6(a)").  In other words, the creation of an option could be considered a purchase or a sale of a security, and therefore could be the basis for liability under Section 16(b).[5]

The regulations also provide that "[u]pon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under section 16(b) of the Act.  The profit shall not exceed the premium received for writing the option."  17 C.F.R. § 240.16b-6(d) ("Rule 16b-6(d)").  In other words, "[u]nder this provision, if an insider writes an option that expires unexercised within six months and profits from doing so on account of having been paid by the purchaser for a right to buy shares that the purchaser did not exercise, the writer will be held liable under section 16(b) for the amount the purchaser paid him or her for the option."  *Allaire*, 433 F.3d at 252-53 (citing *Gwozdzinsky*, 156 F.3d at 309).  "This rule is designed to prevent a scheme whereby an insider with inside information favorable to the issuer writes a[n] . . . option, and receives a premium for doing so, knowing, by virtue of his inside information, that the option will not be exercised within six months."  *Gwozdzinsky*, 156 F.3d at 309.

---

[5] Only the establishment or liquidation (or increase or decrease) of an option can serve as a transaction under Rule 16b-6(a).  The regulations provide that "[t]he closing of a derivative security position as a result of its exercise or conversion shall be exempt from the operation of section 16(b) of the Act."  17 C.F.R. § 240.16b-6(b).

Unlike Rule 16b-6(a), Rule 16b-6(d) does not expressly identify the transactions it covers—the writing and expiration of the option—as either purchases or sales of securities. However, in light of the fact that the statute applies exclusively to purchases and sales of securities that take place within six months, the rule would apply only if the writing and expiration of an option were deemed a purchase and a sale (or vice versa). *See United States v. Larionoff*, 431 U.S. 864, 873 (1977) ("[R]egulations, in order to be valid must be consistent with the statute under which they are promulgated.").  And indeed, when the SEC first proposed the amended regulations covering derivative securities, it stated that "[a] grant of an option may be viewed as a sale of the derivative security by the writer of the option, if consideration is received for the option," and "in the case of an expiration of a short option position, the expiration would be treated as the purchase of the option because there is short-swing profit potential in such a case."  Ownership Reports and Trading by Officers, Directors and Principal Stockholders, Exchange Act Release No. 34-26333, 53 Fed. Reg. 49997-02, 50008, 50009 (Dec. 13, 1988).  *Cf. Gwozdzinsky*, 156 F.3d at 309 ("Thus, under Rule 16b-6(d), any insider who writes a put option on securities of the issuer is liable under Section 16(b) to the extent of any premium received for writing the option if the option is either canceled or expires unexercised within six months of its writing, an event that is deemed a 'sale' for purposes of Section 16(b).").

### 3.      Application of Section 16(b) to this Case

Here, the options at issue were short call options, which the SEC defines as a "put equivalent position," because the value of those options increases as the price of the security decreases.  17 C.F.R. § 240.16a-1(h).  Thus, under Rule 16b-6(a), the writing of those options— the establishment of the put equivalent positions—could be considered sales of the securities for

11

purposes of Section 16(b).  The question is whether the expiration of the options would be considered a purchase of the security.

  This question is critical because Goldman was no longer a statutory insider by the time that the options expired.  Thus, if the expiration of the options was the "purchase" of the securities that would be matched up to the "sale" of the securities (when the short call option was written), Goldman could not be liable, as it would not have been considered an insider "both at the time of . . . the sale and purchase[] of the security involved."  15 U.S.C. § 78p(b).

  Both Plaintiff and Goldman argue, for different reasons, that the expiration of the Options cannot be considered a purchase of those securities.  Goldman argues that the expiration of the Options cannot be considered a purchase, and therefore, there was no purchase to be matched up to the sale for Section 16(b) purposes.[6]  Plaintiff, on the other hand, argues that the expiration of the options does not qualify as a "purchase," and therefore it is irrelevant whether Goldman was an insider at the time of the expiration.  As more fully explained below, the only way to read Rule 16b-6(d) as being consistent with Section 16(b) is if the expiration of an option can serve as a purchase or sale to match the purchase or sale that takes place when the option is written.

  Goldman's argument is based upon a misreading of the Second Circuit's holding in *Allaire Corporation v. Okumus*, 433 F.3d 248.  Goldman argues that "expirations [of options] . . . do not constitute 'purchases' under Section 16 as a matter of settled law under" *Allaire*. (Memorandum of Law of Defendants The Goldman Sachs Group, Inc. and Goldman, Sachs &

---

[6] Goldman makes this argument as an alternative to its primary argument, that because Goldman was no longer a 10% owner when the Options expired, it cannot be liable under Section 16(b).

Co. in Support of Motion to Dismiss Plaintiff's Complaint, Dkt. No. 15, at 10.)  However, the *Allaire* decision is not so broad.

The *Allaire* decision dealt with a defendant who had written a set of call options for the stock of Allaire Corporation, the plaintiff.  Three days later, he acquired shares that brought his ownership stake above 10%, thereby making him a statutory insider under Section 16(b).  Those options expired unexercised approximately one month after they were written.  One month after that, while still a statutory insider, the defendant wrote a second set of call options on Allaire stock.  433 F.3d at 249.  The plaintiff sought to hold the defendant liable under Rule 16b-6(a), on the theory that the expiration of the call options constituted a "purchase" of the securities that could be matched up with the "sale" when the defendant wrote the new set of call options a month later.  *Id.* at 251.  The court affirmed the district court's decision that the expiration did not constitute a purchase for those purposes.  *Id.* at 252.

The court based its decision in part on an earlier holding that "the exercise of a fixed-price option is a non-event for 16(b) purposes . . . because the insider by then is already bound by the terms of the option, [so] the potential for abuse of inside information is minimal."  *Id.* at 251-52 (quoting *Magma Power*, 136 F.3d at 322).  The court observed that, "[a] *fortiori,* when the option is written by the insider (and not canceled), leaving the insider with no control over whether or not it will be exercised, his or her inside information, at least in the usual case, cannot be employed for his or her personal profit."  *Id.* at 252.  Thus, according to the court, the expiration of an option is, like the exercise of that option, a "non-event for 16(b) purposes." *Magma Power*, 136 F.3d at 322.

A broad reading of this holding would invalidate Rule 16b-6(d), which requires only the writing of an option and its expiration to impose liability under Section 16(b).  If the expiration

13

of an option could never be considered a "purchase" or "sale," then Rule 16b-6(d) could not impose liability consistently with Section 16(b), which "requires *both* a purchase and a sale within a six-month period" to impose liability. *Gwozdzinsky*, 156 F.3d at 309 (emphasis added). *Cf. 60 Key Ctr. Inc. v. Adm'r of Gen. Services Admin. (GSA)*, 47 F.3d 55, 58 (2d Cir. 1995) ("When . . . a regulation 'operates to create a rule out of harmony' with the statute under which it is promulgated, the regulation is considered a 'nullity.'" (quoting *Manhattan Gen. Equip. Co. v. Comm'r*, 297 U.S. 129, 134 (1936))).

But it is clear that the Second Circuit did not intend such a holding.  Rather, the court's holding was limited to the context of Rule 16b-6(a):  "Just as the holder's exercise of a call option is not a 'sale' by the writer *under Rule 16b-6(a)*, neither is the expiration of a call option a 'purchase' by the writer *under that provision*."  *Allaire*, 433 F.3d at 252 (emphasis added). Moreover, the court based its decision that the expiration of an option is not covered by Rule 16b-6(a) on the fact that such expirations expressly *are* covered under Rule 16b-6(d).  *See id.* at 253 ("If the expiration of a call option were a purchase under Rule 16b-6(a), what purpose would it serve to provide, as Rule 16b-6(d) does, that the expiration of an option within six months of its writing triggers liability?").  The court ultimately concluded that "the writing of an option may be a 'transaction' under section 16(b) but . . . the expiration of an option, *when matched against any transaction other than its own writing*, is not."  *Id.* at 254 (emphasis added).  Of course this conclusion leaves open the possibility that, as provided by Rule 16b-6(d), "when matched against . . . its own writing," the expiration of an option is a "transaction" for purposes of Section 16(b).

Plaintiff, for his part, also argues that the expiration of the Options was not a purchase. Plaintiff bases his argument on the policy behind the statute.  As the Second Circuit held in

*Allaire*, "section 16(b) covers only the transaction in which the parties agree to the terms of sale, because that is the one in which the writer of the option can be deemed to be using his or her inside information to arrive at the option's terms on a favorable basis." *Allaire*, 433 F.3d at 252; *see also Magma Power*, 136 F.3d at 322 ("In essence, an insider who takes an option position is making a bet on the future movement of the price of the underlying securities; the odds in the insider's favor are foreshortened if the wager is backed by inside information.  Because the acquisition or disposition of the option is the point at which the inside information may be advantageous, the SEC's regime regards it as the triggering event under Section 16(b).").  Plaintiff extrapolates from the fact that the writing of the option is the "triggering event" for Section 16(b) purposes, *id.*, that the writing of the option represents *both* the purchase and the sale of the security.  Thus, according to Plaintiff, Goldman was a statutory insider at all relevant times for purposes of Section 16(b).  The fact that Goldman was no longer a 10% owner at the time of the options' expiration—a "non-event"—is immaterial in Plaintiff's view, since the only "triggering event" was the writing of the option.  Plaintiff argues that a contrary reading would subject Section 16(b) to "manipulation and evasion":  "Any time an insider traded in derivative securities on the basis of material nonpublic information, the insider could evade § 16(b) liability simply by reducing its beneficial ownership below 10% immediately before the expiration of the derivative security."  (Opp. at 9-10.)

As a matter of policy, Plaintiff is correct.  To the extent that Section 16(b) is designed to curb the use of inside information by insiders at the time when such use would be strategically "advantageous," *Magma Power*, 136 F.3d at 322, then it makes sense to interpret Section 16(b) to cover profits earned from writing an option that expires in less than six months, regardless of the insider's status at the time of the expiration of the option.  An insider, knowing information

about the likely imminent movement of the price of a security, could write options to profit from that knowledge, and would not need to continue to be an insider at the time the options actually expire in order to realize that profit.  This is exactly what Rule 16b-6(d) and Section 16(b) seek to prevent.

The problem is that this policy concern is necessarily limited by the plain language of the statute.  The statute imposes liability only for the "purchase and sale" or "sale and purchase" of securities "within any period of less than six months."  15 U.S.C. § 78p(b).  As the Second Circuit has noted, Section 16(b) "requires at least *two* transactions within six months: a purchase followed by a sale or a sale followed by a purchase."  *Magma Power*, 136 F.3d at 325 (quoting Robert Charles Clark, Corporate Law 295-95 (1986)); *see also Gwozdzinsky*, 156 F.3d at 309 ("Liability under Section 16(b) requires *both* a purchase and a sale within a six-month period." (emphasis added)).

Rule 16b-6(d) can be harmonized with this statutory requirement only if the events that the regulation governs (the writing and expiration of an option) can be considered a "purchase" *and* a "sale."  The Supreme Court has observed that "[t]he statutory definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase."  *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594 (1973).  But Plaintiff does not point to any decision holding that a single transaction can somehow be simultaneously both a purchase and a sale.  Plaintiff's reading of Rule 16b-6(d) as focusing only upon the option writer's status at the time of the writing of the option—here, the "sale"—while consistent with the policy behind Section 16, is simply incompatible with the plain language of the statute.

16

As the Supreme Court emphasized in *Reliance Electric Company*, even if a court agrees with "persuasive policy arguments that the Act should be broadened," the court is "not free to adopt a construction that not only strains, but flatly contradicts, the words of the statute." 404 U.S. at 427 (citation omitted). In that case, the Court was faced with a defendant who owned approximately 13% of a corporation's stock, and subsequently disposed of his holdings in two transactions within six months of the purchase the stock. First, he sold enough securities to reduce his holdings to 9.96% of the shares; he forfeited the profits from that sale under Section 16(b). Then, he sold the rest of his holdings and did not forfeit those profits. The plaintiff in the case argued that the two sales were "interrelated parts of a single plan," which should give rise to liability since the plan was devised and initiated while the defendant was a statutory insider. *Id.* at 423.

The Supreme Court rejected that argument, pointing out that, in passing Section 16(b), "Congress did not reach every transaction in which an investor actually relies on inside information. . . . Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under [Section] 16(b). The question is, rather, whether the method used to 'avoid' liability is one permitted by the statute." *Id.* at 422. The Court noted that the statutory requirement that the insider be a 10% owner "both at the time of the purchase and sale," "[r]ead literally, . . . clearly contemplates that a statutory insider might sell enough shares to bring his holdings below 10%, and later—but still within six months—sell additional shares free from liability under the statute." *Id.* at 423. The Court emphasized that the clear requirements of the statute "cannot be disregarded simply on the ground that it may be inconsistent with our assessment of the 'wholesome purpose' of the Act." *Id.* at 424.

17

Here, in order to be liable under Section 16(b), Goldman must have been a statutory insider at the time of the sale and the purchase of the securities at issue.  The equivalent of the sale here was the writing of the short call options on September 30, 2009.  In order to be liable under Section 16(b), that sale must be capable of being matched up to a purchase within six months.  The equivalent of the purchase was the expiration of the options on January 16, 2010.  Because Goldman was no longer a 10% owner on that date, under the plain language of the statute, it cannot be held liable.  The fact that any inside knowledge that Goldman may have possessed (and, to be sure, none is specifically alleged) would be useful only at the time of the writing of the options does not allow the Court to disregard the clear requirements of the statute.

**III.    Conclusion**

Because Plaintiff cannot establish that Goldman is liable to the Company under Section 16(b) for profits Goldman received in connection with the Options, the defendants' motions to dismiss this shareholder derivative complaint (Dkt. Nos. 13 and 18) are GRANTED.

SO ORDERED.

Dated: New York, New York
       June 5, 2012

_____
J. PAUL OETKEN
United States District Judge

18